# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| HALEY A. ANDERSON and DEAN and JODIE ANDERSON, husband and wife, individually and as parents of HALEY A. ANDERSON,<br><br>            Appellants,<br><br>            v.<br><br>SNOHOMISH SCHOOL DISTRICT NO. 201, a municipal corporation, PETER WILSON and JANE DOE WILSON, husband and wife and their marital community, WENDY NELSON and JOHN DOE NELSON, husband and wife and their marital community,<br><br>            Respondents. | No. 80218-6-I<br>(consolidated with<br>No. 80310-7-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — The Andersons sued the District for negligence after their daughter, Haley, suffered a concussion while riding the Matterhorn at Disneyland during a school field trip and suffered a second impact to her head while continuing to go on rides. They appeal summary judgment dismissal of their claim against the District. Specifically, they contend that there was a genuine dispute of material fact as to whether the District breached its duty of care to Haley. We affirm.

FACTS

In 2014, Haley Anderson was a student at Snohomish High School and a member of the school's band. She went on a band-sponsored field trip to California, over spring break. On April 8, the band went to Disneyland.

According to Haley's[1] boyfriend at the time, Mitchell Gibbs, the two got on the Matterhorn ride at Disneyland between 1:30 p.m. and 2:00 p.m. Gibbs testified that he sat in front of Haley during the ride. After the two got off the ride, Gibbs testified that Haley told him she hit her head and did not feel well. As a result, they sat down, and Gibbs went to get Haley something to drink. When Gibbs returned, he asked Haley if she was feeling better. He testified that Haley said, "[Y]es," and the two went to meet their friends at the Haunted Mansion ride. He testified that they also went on some nighttime rides after dinner. However, when they stopped at a chaperone[2] station at 10:30 p.m., he stated that Haley fell asleep and he had trouble waking her up. Once he woke her up, he carried her back to the hotel and told another student to tell Wendy Nelson, a parent volunteer on the trip, about Haley hitting her head. Nelson served as the trip coordinator, but was not one of Haley's assigned chaperones. Gibbs testified that up until that point neither he nor Haley had told any adults on the trip about her injury.

According to Haley, the night of April 8, she and Gibbs rode the Matterhorn at around 9:00 p.m. She agreed that Gibbs sat in front of her during the ride. As the ride went around a corner, she explained that she was thrown backwards and

---

[1] We use Haley's first name for clarity.
[2] Haley's assigned chaperones were Julie Bailey and Craig Pratt.

hit her head on the headrest. Once the ride was over, she stated that she sat down on a park bench and told Gibbs that she hit her head and did not feel well. She then recalled going to dinner and checking in at a chaperone station at 10:00 p.m. Although her head hurt and she felt dizzy, she testified that she did not tell any of the chaperones at the station about her symptoms. She also testified that she did not go on any more rides that night.

According to Nelson, when the students returned that night, she went to Haley's hotel room because her daughter was one of Haley's roommates. Before entering the room, she testified that her daughter and another student informed her that Haley had a headache. In a statement she drafted after the trip, Nelson wrote that Haley told her she hit her head while on the Matterhorn. However, Nelson later testified that she did not recall that conversation, and that Haley only asked her for some Tylenol. Nelson stated that she told Haley she did not have any Tylenol, and that she needed to contact her chaperone and parents if she had a headache.

According to Haley, Nelson came to her hotel room when she got back that night, asked her if she hit her head, and she said, "[Y]es." She testified that Nelson then pulled her out of her room to evaluate her, and that her chaperone Julie Bailey was there as well. Haley further testified that Nelson explained to her that her husband's job required first aid training, she had called him, and he told her, "[Y]ou need to look at someone's eyes and look at their pupils." At that point, Haley stated that Nelson "got really close" to her face, looked at her eyes, and told her, "'Your pupils are the same size and you don't look concussiony.'" Nelson did not have

3

any formal medical training. Haley also recalled Nelson telling her to take pain medication for her headache, to call her parents, and that she would check on her in the morning.[3]

Just after midnight on April 9, Haley sent her father, Dean Anderson, the following text message:

> "Hey, I hit my head pretty hard while I was on the Matterhorn today about 2-3 hours ago. I'm just texting to let you know in case you get a call from [band director Peter] Wilson or [Nelson] tomorrow about me. I didn't call because I don't want to wake you all up. I'm sure I'm fine, but I wanted to let you know just in case. Good night. I love you all and I'll call you tomorrow."

She forwarded the message to her mother, Jodie Anderson, at around the same time. Dean[4] testified that he texted Haley back in the morning to ask how she was doing, but could not recall what she said in response. Neither Jodie nor Dean made any attempts to contact any of the adults on the trip. Jodie testified that from what she was hearing, there did not appear to be a problem.

Haley testified that the morning of April 9, she had a headache. While she was eating breakfast that morning, she recalled Nelson asking her how her head was. She told Nelson that she was fine. She did not recall telling Nelson anything else. Throughout the remainder of the trip, Haley continued to go on rides at amusement parks and experienced symptoms like headaches and nausea. Particularly, on April 12, she rode a rollercoaster at SeaWorld called Manta. She testified that, after the ride,, her head was spinning and hurt worse than it had on

---

[3] Haley had a history of chronic headaches. As a result, Haley's mother had given permission for Haley to take two milligrams of ibuprofen every six hours while on the trip.

[4] We refer to Dean and Jodie by their first names for clarity.

the previous days. She also stated that she could not think straight and felt nauseous. However, <u>she concedes that she did not report any symptoms she experienced after April 8 to Nelson or her assigned chaperones</u>. She explained that because Nelson told her she did not have a concussion, she was under the impression that she had only a headache.

The band flew home on April 13. When Haley arrived at home, she told her parents that she did not feel well. The next morning, she had a headache and felt dizzy, and she told her mother that she still did not feel well. Jodie took Haley to the Everett Clinic that same day, where she was diagnosed with a concussion. Haley continued to experience symptoms and did not return to school for most of the remainder of the year. In September 2015, Dr. Stephen Glass, a child neurologist, opined that Haley suffered a concussion after hitting her head on the Matterhorn and suffered a "'second impact'" by remaining physically active between April 8 and April 13. Because she was not properly treated for the concussion, he concluded that this second impact was causing her persistent symptoms and ongoing impairment.

In May 2016, the Andersons[5] sued Snohomish School District No. 201 (District), Wilson, and Nelson for negligence relating to Haley's concussion. They alleged that while acting as agents for the District, Wilson and Nelson failed to provide Haley reasonable and necessary medical care after her head injury.[6] They further alleged that Wilson's and Nelson's failure to prevent ongoing trauma to

---

[5] We refer to Haley and her parents collectively as "the Andersons."

[6] Although Nelson was not a District employee, the District admitted that she was its agent and was acting under the scope of her agency on the trip.

Haley's head, "second impact syndrome," was a proximate cause of Haley's injuries and damages.

The District[7] later moved for summary judgment dismissal of the Andersons' claims. It argued in part that the adults on the trip responded to Haley's "isolated report of a headache" in a reasonable manner. Specifically, it asserted that there was no evidence of a duty or standard of care that requires one to assume a concussion from Haley's "limited description" of having a headache. It explained that it implemented reasonable measures for students to report injuries during the trip, but that Haley did not use them. Instead, it pointed out, she failed to disclose any other symptoms beyond her initial headache until after the trip.

The Andersons opposed the District's motion. They argued in part that the District's "Concussion Form (2151F4)" established that the harm at issue was foreseeable. Form 2151F4 is a form the District has student athletes and their parents sign regarding the risks and symptoms of a concussion. It directs parents to seek medical attention right away if their child reports any concussion symptoms, or if they notice any concussion symptoms in their child. The Andersons further argued that even if Jodie and Dean acted wrongfully in not doing more after learning Haley hit her head, the District necessarily acted wrongfully based on the custodial relationship it had with her. In addition, the Andersons filed a motion to strike certain alleged facts and evidence from the District's summary judgment motion. This included alleged hearsay statements in a handwritten

---

[7] We refer to the District, Wilson, and Nelson collectively as "the District."

statement drafted by Nelson, as well as evidence relating to a volunteer packet and chaperone guidelines.

The trial court granted the District's motion. It explained in part,

> Assuming for the sake of argument that [Nelson's] role as trip coordinator gave her the same status as a chaperone, as the school dist[ri]ct has conceded, then her duty to Haley was one of reasonable ordinary care under the circumstances. As a chaperone, her duty to Haley is to speak to the child, assess the issue, and inform her to call her parents—which she did. Any further injury at that point was not foreseeable as Haley was reticent in her response to Mrs. Nelson['s] questions other than to say "I have a headache" and ["]I feel fine." These are the exact statements Haley made to her parents. Mrs. Nelson, like Haley's parents, reasonably relied on Haley's statements that she was fine.

The court noted that "[u]nlike student athletes who are protected by a mandated concussion protocol, there is no district policy or mandate requirement that would override the students' responses." It pointed out that "Snohomish County School District Policy 3431 requires that word of illness or accident be sent to the principal's office and the nurse," but that the school was closed on April 8. It also cited a declaration stating that the principal's primary duty in that situation is to inform the parents. It explained that this was "exactly what Mrs. Nelson accomplished." The record does not reflect that the court ruled on the Andersons' motion to strike.[8] The Andersons then filed a motion for reconsideration, which the court denied.

---

[8] The order granting summary judgment does not inform us whether the trial court granted the motion to strike. The only other mention in the record addressing the motion to strike is the clerk's notation stating that it was not argued at the hearing on the District's motion for summary judgment. As a result, we assume that the motion to strike was not granted. But, we do not rely on the materials the Andersons sought to strike.

The Andersons appeal.

DISCUSSION

The Andersons argue that the trial court erred in granting the District's summary judgment motion because there was a genuine dispute of material fact as to whether the District breached its duty of care to Haley. Specifically, the Andersons assert that the trial court failed to review the facts regarding duty in the light most favorable to them. They state that the order of dismissal "barely reference[d]" Nelson's evaluation of Haley, in which Nelson allegedly told Haley she did not look "'concussiony.'" They claim that the order failed to mention Bailey's testimony that Nelson shared in chaperoning Haley. They also claim that it failed to mention Haley's testimony that Bailey was present during Nelson's evaluation and knew of Haley's complaints. Further, they state that it failed to mention there was a nurse on the trip who was never consulted.[9] And, they state that it failed to mention Nelson's decision not to inform Wilson, the District employee on the trip, of Haley's injury. The Andersons argue that this evidence created a genuine dispute of material fact as to whether the District breached its duty.

We review summary judgment orders de novo. Hadley v. Maxwell, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). Summary judgment is appropriate only

---

[9] This statement appears to be based on Wilson's testimony that he thought a parent of a child on the trip was a nurse. Wilson followed up that statement by testifying he did not have direct knowledge that any of the chaperones "were trained or, you know, had their first aid card or whatever or [cardiopulmonary resuscitation] training." The Andersons do not cite evidence that Nelson knew there might be a nurse on the trip. And, they do not dispute that there was no school nurse on the trip.

where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Peterson v. Groves, 111 Wn. App. 306, 310, 44 P.3d 894 (2002). The moving party bears the initial burden of showing that no issue of material fact exists. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

"A defendant may move for summary judgment by showing that there is an absence of evidence to support the plaintiff's case." Sligar v. Odell, 156 Wn. App. 720, 725, 233 P.3d 914 (2010). If the defendant meets this initial showing, the inquiry then shifts to the plaintiff. Young, 112 Wn.2d at 225. If the plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then the trial court should grant the motion." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). When considering the evidence, the court draws reasonable inferences in the light most favorable to the nonmoving party. Schaaf v. Highfield, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).

To prevail in their negligence suit, the Andersons must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury. N.L. v. Bethel Sch. Dist., 186 Wn.2d 422, 429, 378 P.3d 162. The parties agree that the District owed a duty to Haley. What they disagree on is whether the evidence showed a genuine dispute of material fact as to whether the District breached that duty.

In Washington, school districts have "an enhanced and solemn duty to protect minor students in [their] care." Christensen v. Royal Sch. Dist. No. 160,

9

156 Wn.2d 62, 67, 124 P.3d 283 (2005). They must exercise the care that an ordinarily responsible and prudent person would exercise under the same or similar circumstances. N.L., 186 Wn.2d at 430. Further, school districts must take certain precautions to protect the students in their custody from dangers reasonably to be anticipated. Hendrickson v. Moses Lake Sch. Dist., 192 Wn.2d 269, 276, 428 P.3d 1197 (2018). If the harm at issue was reasonably foreseeable, a school district may be liable if it failed to take reasonable steps to prevent that harm. Id. When foreseeability is a question of whether the harm was within the scope of the duty owed, it is a question of fact for the jury. McKown v. Simon Prop. Grp., Inc., 182 Wn.2d 752, 764, 344 P.3d 661 (2015). The question is whether the actual harm fell within a general field of danger that should have been anticipated.[10] Hendrickson, 192 Wn.2d at 276.

The Andersons contend that the District's written policies "further define the duty it owes to students." Thus, they assert that "[w]hether Nelson complied with District policy is evidence of her negligence." They go on to cite multiple District forms and policies.

First, they cite a form titled "Duties and Responsibilities of Adult Supervisors/Chaperones Accompanying Students on Instructional Field Trips."

---

[10] The Andersons do not argue that the District breached its duty of care to Haley by allowing her to hit her head on the Matterhorn in the first place. Rather, they suggest that the District breached its duty by not ensuring Haley received prompt medical care, which would have resulted in her not going on additional rides and receiving a second impact injury. That injury was foreseeable if the District knew or should have known that Haley had a concussion. Haley did not report further symptoms to the District during the trip. Thus, the issue here is whether the District exercised reasonable care in response to what it was told by and about Haley's injury on April 8 and the morning of April 9.

The form does not specifically address the protocol for handling student injuries, but directs supervisors and chaperones to "assure prompt medical care if anyone becomes injured or ill." Second, they cite form 5430P, which provides that volunteers shall "[r]efer to a regular staff member for final solution of any student problems which arise, whether of an instructional, medical or operational nature." The Andersons imply that the District violated this policy because Nelson did not inform Wilson of Haley's injury. Third, they cite form 2151F4, which addresses the risk and symptoms of concussions in student athletes. They argue that because the District knew that every head injury to a student is serious, it also knew that continued activity after a head injury could cause additional serious injury. Last, they cite a declaration by their expert Dr. Ronald Stephens, executive director of the National School Safety Center. Stephens opined,

> The District, by and through its agents, violated its own standard of care by: failing to provide sufficient information to adult volunteers on the trip as to how to properly respond to a student injury, specifically, a head injury. The District was aware, prior to the trip, [of] the potential severity of head injuries and that students underreport those injuries.

In response, the District cites form 3431, which addresses its policy on student injuries. The form provides in part, "[S]chools are responsible for providing first aid or emergency treatment in case of sudden illness or injury to a student," but "further medical attention is the responsibility of the parent or guardian." (Emphasis added.) It also requires that "[w]ord of the illness or accident . . . be sent to the principal's office and to the nurse," and that the principal or designated staff "should immediately contact the parent so that the parent can arrange for care

11

or treatment." The Andersons do not challenge the substance of this policy. Nor do they dispute that there was no principal or school nurse on duty during spring break. In a declaration by Thomas Laufmann, the executive director of Business Services for the District stated that "[o]n its face, District Policy #3431 requires notification of a student injury to the principal and the school nurse." He further explained,

> During such outings . . . where school is not in session and neither a Principal nor a nurse are on duty, the purpose of Policy #3431 is satisfied by accomplishing either direct parental notification in other ways—i.e., through a direct call from student-to-parent, or from chaperone-to-parent. The same would be true for a coach who notifies a parent of an athlete non-emergency injury, when the parent meets the bus upon return from an away-game.

He continued, "[I]f there is no emergency, the goal is to ensure that the parent receives notice of the non-emergency injury or illness, so that they can determine next steps for their own child and seek treatment if they choose."

The Andersons do not cite evidence that Haley's reported symptom of a headache on April 8 constituted an emergency. Neither Glass, the child neurologist who served as the Andersons' expert, nor Dr. Marisa Osorio, who treated Haley after the trip, testified that Haley's headache required emergency medical treatment on April 8 or the morning of April 9. In fact, Osorio was asked at a deposition about the symptoms Haley reported to be suffering at the time of her April 14 visit to the Everett Clinic—a headache and trouble remembering what happened the evening of the injury. Osorio testified that Haley's reported symptoms did not require calling 911, and she would not have recommended that Haley needed to go to an emergency room.

12

In addition, neither Glass nor Osorio testified that the District should have sought <u>nonemergency</u> medical treatment for Haley on April 8 or the morning of April 9. Glass made a general observation that "if a child reports a concussion, or symptomatic injury, medical attention should be sought." But, he did not opine as to whether the District should have sought medical attention for Haley when she reported a headache on April 8. Osorio testified that if a hypothetical patient hit their head on a ride, reported headaches and memory problems, and had a normal neurologic exam, she would recommend activity restrictions, talk about sleep, and talk about other symptoms. But, she did not opine as to whether the District should have sought medical attention for Haley based on her April 8 headache. In the absence of evidence establishing a duty to take Haley to a medical provider on April 8 or April 9, even on a nonemergency basis, the District's duty under form 3431 was to notify her parents of the injury so that they could determine any next steps. The District discharged its duty when Nelson instructed Haley to inform her parents, Haley then sent a text message to her parents about hitting her head, and Haley communicated with her parents the morning of April 9.

The District policy in form 5430P required volunteers to refer a student's medical problem to a staff member. Wilson was not informed by Nelson before the Andersons were notified. The Andersons imply that but for the breach of this policy, Wilson would have known of Haley's injury, and she would have been taken to a doctor. This assumption is not supported by the record. When asked at a deposition if he would have taken the "appropriate steps" if he had known about the problem, including "<u>either</u> telling the parents <u>or</u> getting medical care <u>or</u>

something," Wilson responded, "Of course." (Emphasis added.) But, even if Wilson might have done more than contact Haley's parents, the policy in form 3431 did not require him or the District to do more in a nonemergent situation. Beyond rendering first aid or emergency treatment, form 3431 states that "further medical attention is the responsibility of the parent or guardian." This policy was implemented even though Wilson was not included in the communication. Haley's parents were promptly notified of her injury and did not direct any further medical treatment. Regardless of which adults on the trip knew of Haley's injury, the District's response complied with the policy in form 3431.

Further, the District argues that it has no duty to seek medical attention every time a student reports hitting their head and having a headache. It notes that Washington's Zackery Lystedt Law (Lystedt law), RCW 28A.600.190, which requires youth athletes be removed from play immediately when they are suspected of sustaining a concussion or head injury, applies only to student athletes.[11] It argues that "[t]o create Lystedt-like duties for schools, toward every student, based on the imputed knowledge that 'all concussions are potentially serious' would completely change the landscape of school liability for student head injuries."

The Lystedt law plainly applies only to student athletes. See RCW 28A.600.190. The concussion form the Andersons rely on is also directed to the parents of student athletes. The Andersons cite no District policy or legal authority

---

[11] The Andersons do not explicitly argue that the District had a statutory duty to seek medical care for Haley or prevent her from engaging in further activities.

that would mandate medical care for every student that bumps her head, states she has a headache, and later states she feels fine. As established above, Haley notified her parents of her injury after she spoke with Nelson. This notification fulfilled form 3431's goal of ensuring parents receive notice of their student's nonemergency injury or illness.

In addition to their District policy arguments, the Andersons contend that Haley relied on Nelson's evaluation of her, in which Nelson told Haley she did not look "'concussiony.'" The record does not reflect that Haley ever told Jodie or Dean about Nelson's evaluation or statement that Haley did not look "concussiony." Nor do the Andersons argue that Jodie or Dean relied on Nelson's evaluation or statement. The Andersons also point to Glass's testimony that "it is medically insufficient and inappropriate for a person with no medical training to attempt to identify a concussion by looking at the eyes of a student." Even so, Glass's statement does not answer whether the District had a duty based on the facts in this case to seek medical treatment for Haley on April 8 or the morning of April 9.

The Andersons also contend that the trial court created a new and unsupported duty when it explained that Nelson's duty as a chaperone was "to speak to the child, address the issue, and inform her to call her parents." What the trial court actually said is that Nelson's duty was "to speak to the child, <u>assess</u> the issue, and inform her to call her parents." (Emphasis added.) Either way, the record does not support their contention that the trial court created a new and unsupported duty. School districts have a duty to exercise the care that an ordinarily responsible and prudent person would exercise under the same or

15

similar circumstances.  N.L., 186 Wn.2d at 430.  No authority has been advanced to suggest that in a nonemergency situation when a child is physically in the care of the school district this duty precludes the district from notifying parents and providing them the opportunity to exercise decision-making authority.  Nor has any authority been advanced to suggest that this duty is greater than the duty of the parents in similar circumstances.

The Andersons' negligence claim is premised on the allegation that Haley suffered a second impact after sustaining a concussion on April 8 and continuing to go on rides from April 9 to April 12.  They do not allege that the District was negligent in allowing Haley to hit her head in the first place.  We acknowledge that Haley has suffered severe and lasting symptoms that have continued to affect her life.  But, there is no evidence before us indicating the District had a duty to seek medical attention for her on April 8 or the morning of April 9.  Specifically, there is no expert testimony that her April 8 injury required emergency or nonemergency medical treatment that night or the next morning.  Haley's parents were notified of her injury as required under form 3431, they had an opportunity to inquire of Haley, and they did so on the morning of April 9.  They did not inquire further of the District, direct a medical evaluation, or instruct that Haley be held out of further activities.  They do not claim that they were unable to contact the District if they had wished to do so.  They do not state what more, if any, information the District should have communicated to them regarding Haley's injury.  The morning of April 9, Haley told Nelson she felt fine and did not tell Nelson she still had a headache.  The Andersons do not dispute these facts.

Viewing the facts in the light most favorable to the Andersons, the Andersons failed to raise a genuine dispute of material fact as to whether the District breached its duty to Haley.  The trial court did not err in granting summary judgment.[12]

We affirm.

_Appelwick, J._

WE CONCUR:

_Bowman, J_          _Leach, J._

---

[12] The Andersons further argue that the trial court should have granted its motion for reconsideration for the same reasons it should have denied the District's motion for summary judgment.  Because the court did not err in granting summary judgment, it did not err in denying reconsideration.